Docketed

Paul L. Kattas (PK 6222)
KELLEY DRYE & WARREN LLP
200 Kimball Drive
Parsippany, New Jersey 07054
(973) 503-5900

-and-

Paul F. Doyle (*Pro Hac Vice*)
Philip D. Robben (PR 4135)
Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
(212) 808-7800

Attorneys for Plaintiff

> ORIGINAL FILED
>
> JUN 18 2003
>
> WILLIAM T. WALSH, CLERK

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---------------------------------------------------x
                          :

NATIONAL FERTILIZERS LIMITED,    :
                          :
         Plaintiff,        :    Civil Action No. 01-5397 (JAG)
                          :
    -against-         :
                          :
MURTY S. VEPURI and        :    SECOND AMENDED COMPLAINT
VARALAXMI VEPURI,        :    AND DEMAND FOR JURY TRIAL
                          :
        Defendants.     :
                          :
---------------------------------------------------x

       Plaintiff, National Fertilizers Limited, by and through its attorneys, Kelley Drye

& Warren LLP, as and for its complaint against defendants Murty S. Vepuri and Varalaxmi

Vepuri, alleges as follows:

## THE PARTIES

      1.    Plaintiff, National Fertilizers Limited ("NFL"), is a corporation organized

and registered under the Indian Companies Act of 1956 and is wholly owned by the government

OFFICE COPY

of India.  NFL's principal place of business is located at SCOPE Complex, Core III, 7, Institutional Area, Lodhi Road, New Delhi-110 003, India.  NFL is the victim of a massive fraud which resulted in a loss to NFL of in excess of $38 million.

2.      Upon information and belief, Murty S. Vepuri ("Mr. Vepuri") is a citizen of the State of Pennsylvania who resides at 1707 Scott Drive, Newtown, Pennsylvania 18940.

3.      Upon information and belief, Varalaxmi Vepuri ("Mrs. Vepuri") is a citizen of the State of Pennsylvania who resides at 1707 Scott Drive, Newtown, Pennsylvania 18940.  Upon information and belief, Mrs. Vepuri is Mr. Vepuri's wife.  (Collectively, Mr. Vepuri and Mrs. Vepuri will be referred to herein as the "Vepuris.")

4.      The Vepuris, prior to moving to Pennsylvania, were, upon information and belief, long-time citizens of the State of New Jersey.  The Vepuris still maintain a presence in New Jersey through Veratek Inc., a New Jersey corporation they completely control, which they operate out of their Newtown, Pennsylvania home.

### JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(4) due to the fact that the amount in controversy in this action exceeds the sum of $75,000, exclusive of interest and costs, and this action is between a foreign state, as defined in 28 U.S.C. § 1603(a), as plaintiff and the citizens of a state.  The Court has personal jurisdiction over the defendants because each of the torts described below committed by the defendants was committed in New Jersey.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 in that a substantial part of the events and/or omissions giving rise to the claims asserted in this action occurred in this district.

## SUMMARY OF ACTION

7.     This action springs from a massive fraud in which NFL was swindled out of over $38 million by a network of co-conspirators operating in Turkey, the United States, the United Kingdom, India, Dubai, and Greece. The Vepuris were co-conspirators in the fraud and received $2 million of the proceeds of such fraud.

8.     The fraud was centered around a contract for the sale of urea fertilizer, a commodity important to agriculture in India.

9.     The conspiracy was headed by Karsan Danismanlik Turizm Sanayi Ticaret Ltd. Sti. ("Karsan"), a Turkish corporation. Karsan, assisted by moles within the NFL organization as well as co-conspirators around the world, induced NFL to enter into a "contract" which was never to be performed via numerous fraudulent representations regarding Karsan's status as a manufacturer of urea, Karsan's intention to perform, and the scope of insurance Karsan would obtain to protect NFL's prepayment of the $38 million contract price. In reality, the "contract" was nothing more than a vehicle to fraudulently disburse $38 million to various individuals and entities, including the Vepuris, around the world.

10.     Karsan was also assisted in this fraud and distributed the $38 million proceeds of the fraud to individuals and entities all over the world.

11.     The Vepuris, a husband and wife team, were the operatives of the conspiracy based in the United States. Pursuant to the fraud, Karsan distributed $2 million to a corporate shell entity completely controlled by the Vepuris.

12.     When subpoenaed to testify about the events surrounding this transfer of the proceeds from Karsan's international fraud, Mr. Vepuri initially asserted his Fifth Amendment right against self-incrimination.

13.   Throughout the world the individuals and corporations involved with the scheme to defraud NFL have faced the consequences of their actions.  Numerous suspects within NFL itself have been fired or suspended.  What is more, the authorities in Switzerland, whose banks were used to carry off the fraud, have seized and/or blocked numerous bank accounts held by Karsan and its principals.

14.   NFL now brings this action in an effort to recover the funds transferred to the Vepuris, which are essentially stolen funds rightfully belonging to NFL and which NFL has the right to recover as well as all other amounts NFL lost on account of the fraud, for which the Vepuris as co-conspirators are jointly and severally liable.

## FACTS

### NFL Attempts To Purchase Urea On The World Market

15.   In India, urea is considered an essential commodity and its import into the country is the exclusive province of the Department of Fertilizers of the Government of India.

16.   During the relevant period, the Department of Fertilizers carried out the import of urea through various specially authorized agencies known as canalising agencies.

17.   NFL was one such authorized canalising agency appointed by the Department of Fertilizers to import urea.

18.   Commencing in October 1994, NFL began the process of accepting bids for the supply of urea through bid requests known as tenders.

19.   After the first two tenders failed to result in fruitful bids for urea, NFL's board of directors voted to limit future tenders to manufacturers of urea, their authorized agents, and suppliers.  In keeping with a policy adopted by the Department of Fertilizers in April 1995, however, NFL was inclined to give more liberal terms to producers of urea to encourage dealings

directly with dealers. Among the more liberal terms NFL would grant to a producer of urea (as opposed to a trader) was the waiver of NFL's usual requirement of a performance bond or an earnest money deposit.

20.     On the occasion of NFL's third tender, which was limited to manufacturers of urea, their authorized agents, and suppliers, one of the entities which bid to sell urea to NFL was Karsan.

## The Failed Contract With Karsan

21.     By bidding on the third tender, Karsan represented that it was a manufacturer of urea, not just a trader in the commodity.

22.     Karsan, however, was not at that time, and did not thereafter become, a manufacturer of urea fertilizer.

23.     Although not known by NFL at the time, at one point in July 1995, Karsan and NFL had completed a contract under which NFL would purchase $38 million worth of urea from Karsan. The transaction fell through, however, when Karsan became dissatisfied with NFL's proposed method of payment.

24.     Although not known by NFL at the time, and not discovered until at least as late as May 1996, immediately upon reaching the July 1995 agreement with NFL, Karsan issued a number of irrevocable payment orders for the benefit of several individuals for a total value of $11 million.

25.     Moreover, the size of these guaranteed payment orders compared to the total value of the proposed sale to NFL casts doubt on Karsan's intention to perform. By having to distribute so much money right off the top, Karsan, to perform under the contract with NFL,

would have had to obtain the urea at an effective price much lower than the price then prevalent

on the world urea market.

26.     Although not known to NFL at the time, it is probable that the July 1995

contract and the representation surrounding it were nothing but a failed attempt defraud NFL.

## The Vepuris Prepare To Participate In The Conspiracy

27.     Around the time the July 1995 contract with NFL failed to come together,

the Vepuris were busy in the United States setting themselves up to participate in and benefit

from the fraudulent scheme.

28.     The tool through which the Vepuris intended to, and did, participate in the

Karsan-led fraud is the now defunct Bermuda entity known as Malyn Holding Ltd. ("Malyn").

29.     Malyn was incorporated in Bermuda on March 1, 1994.

30.     By August 2, 1995, while they were citizens of New Jersey, the Vepuris

had obtained control of Malyn.

31.     Mr. Vepuri was Malyn's president. Mrs. Vepuri was Malyn's vice-

president. Together, the Vepuris were Malyn's principal directors.

32.     On or about September 21, 1995, the Vepuris, while they were citizens of

New Jersey and acting as the principals of Malyn, opened an account in Malyn's name in New

Jersey at Midlantic Bank, N.A. ("Midlantic") by executing an agreement, specifically made

subject to the laws of the New Jersey and the United States, entitled an "Institutional Custody

Agreement For A Corporation."

33.     In paragraphs 2 and 4 of the Institutional Custody Agreement, the Vepuris

put themselves in complete control of the account at Midlantic. By these paragraphs, Midlantic

was obligated to take instructions regarding the account only from the Vepuris, or either of them.

34.   Malyn's Midlantic account was, therefore, under the Vepuris' total control.

35.   The establishment of the Midlantic account in New Jersey set the stage for the Vepuris to receive a portion of the proceeds from the international fraud.

36.   Starting on September 22, 1995 and continuing through early November 1995, Malyn's account at Midlantic was funded by the Vepuris.

37.   Funding for Malyn's Midlantic account came in the form of periodic lump sum deposits, ranging from approximately $25,000 to $500,000 each, drawn from a variety of sources, including the Vepuris' personal funds and funds contributed by a corporation controlled by Mrs. Vepuri and the Vepuris' children.

38.   As of November 11, 1995, the deposits to Malyn's Midlantic account totaled over $2.5 million.

39.   As soon as Malyn's Midlantic account was partially funded, the Vepuris began to use the account to trade in the securities of a number of companies.

**NFL's November 9, 1995 Agreement With Karsan**

40.   From the time that the July 1995 agreement with Karsan fell through, certain officials of NFL continued to discuss a potential sale of urea by Karsan to NFL even after the July 1995 agreement fell through.

41.   During this time, Karsan continued to represent itself to NFL as a manufacturer of urea or allowed NFL to labor under the misapprehension that Karsan was a manufacturer of urea.

42.     Karsan wished for NFL to believe that Karsan was a manufacturer of urea because NFL had a policy of treating manufacturers of urea more liberally than it treated traders or other, non-manufacturer suppliers of urea.

43.     By October 30, 1995, Karsan had faxed a draft agreement to NFL, had instructed NFL as to where a payment for the insurance provided for by the draft agreement could be sent, and notified NFL that Sambasiva Rao, a resident of Hyderabad, India, was Karsan's agent with regard to the transaction.

44.     NFL's dealings with Karsan centered around D.S. Kanwar, NFL's Executive Director of Marketing.  Mr. Kanwar strongly pushed ahead with the proposed Karsan sale without authority to do so and without emphasis on the usual safeguards NFL usually insisted upon to protect itself.  Mr. Kanwar received support in this endeavor from C.K. Ramakrishnan, the Managing Director of NFL at the time.  Upon information and belief, Mr. Kanwar was acting as Karsan's mole within the NFL organization in furtherance of the fraudulent scheme.

45.     Mr. Kanwar's efforts to push through NFL's approval of the draft agreement with Karsan were extraordinary.  Within one day of NFL's receipt of the draft agreement, Mr. Kanwar took steps to finalize NFL's approval of the draft.

46.     In keeping with his rush to get NFL to finalize the agreement, Mr. Kanwar also approved the transfer of $380,000 to Karsan's bank, Pamuk Bank in Ankara, Turkey, ostensibly in satisfaction of certain provisions of the yet un-finalized draft agreement regarding insurance.  NFL's bank, the State Bank of India, forwarded the $380,000 to Pamuk Bank on November 2, 1995.  The money was later returned to NFL's bank without explanation.

47.     On November 9, 1995, the draft agreement (the "November 9th Agreement") was finalized and executed by NFL.

48.     The November 9th Agreement provided for NFL's purchase of 200,000 metric tonnes of urea at a price of $190 per metric tonne.

49.     The total price to be paid by NFL under the November 9th Agreement was $38 million.  This amount was divided into two amounts:  the $380,000 amount previously paid for insurance and $37,620,000 which was to be pre-paid, in cash, prior to Karsan's delivery of any shipments of urea under the contract.

50.     Karsan was to deliver two 25,000 metric tonne shipments immediately upon receipt of NFL's $37,620,000 cash prepayment.  The other 150,000 metric tonnes were to be delivered within five months of NFL's prepayment of $37,620,000.

51.     Karsan falsely represented to NFL that cash prepayment was needed to provide Karsan with the funds it needed to obtain urea on the world market.

52.     It was against NFL's usual operating policies to make cash in advance payments, especially in an amount as high as $38 million.

53.     NFL was induced to make such a large cash in advance payment by the provisions of the contract in which Karsan obligated itself to obtain "a first class Lloyds insurance policy" to guarantee against Karsan's non-delivery and non-performance.

54.     Ostensibly in compliance with these provisions of the November 9th Agreement, Karsan provided NFL with an insurance cover note showing that an insurance policy had been obtained which would cover both Karsan's non-performance and non-delivery of the urea.

55.     Karsan also contemporaneously delivered to NFL a letter from Mediterranean Insurances Ltd. to NFL which letter further asserted that the referenced insurance policy would fully protect NFL.  Karsan also delivered a letter of exchange and corporate promissory note to NFL as a further guarantee of the $38 million cash prepayment.

56.     Karsan's representations regarding the insurance policy were false, however, in that the policy secured by Karsan only protected NFL against purely maritime risks, not Karsan's failure to perform or failure to deliver.

57.     Based upon Karsan's prior dealings with Mediterranean Insurances, Ltd., which confirmed that the insurance policy obtained would not cover the risks of non-delivery and non-performance by Karsan, Karsan knew that its representations regarding the insurance policy were false.

58.     Karsan intentionally made these false representations to NFL as part and parcel of a scheme to defraud NFL by inducing NFL to make a huge cash prepayment of over $37 million, which NFL would not normally have made.

59.     Indeed, Mediterranean Insurances, Ltd. was a co-conspirator with Karsan and assisted with the perpetration of the fraud.

60.     On November 9, 1995, NFL wrote to Mediterranean Insurances, Ltd. to confirm that the insurance policy did in fact cover all risks, including Karsan's non-performance and non-delivery.

61.     Although Mediterranean Insurances had been previously notified that the policy did not cover the risk of Karsan's non-performance and non-delivery, Mediterranean Insurances nevertheless responded to NFL in the affirmative, fraudulently confirming NFL's

belief that the policy was an all risks policy covering the risks of both Karsan's non-performance and non-delivery.

62.     It was not until Mr. Ramakrishnan departed NFL in May 1996 that NFL discovered the true nature of the insurance policy.

## NFL Makes Payment Under The November 9th Agreement

63.     In November 1995, when NFL was still unaware of the true nature of the insurance agreement, and still relying upon Karsan's misrepresentations regarding the policy and its limits, NFL began to take steps to transfer the $37,620,000 required under the November 9th Agreement by instructing its bank, State Bank of India in New Dehli, India, to transfer $37,620,000 to Karsan's bank, Indosuez Bank in Geneva, Switzerland.

64.     NFL's first transfer of the money was thereafter rejected by Indosuez Bank due to Indosuez Bank's concerns regarding the transaction.

65.     Although not known to NFL at the time and not until months later, Indosuez Bank's decision to return NFL's money was motivated by Indosuez Bank's discovery as to the true nature of the insurance policy underlying NFL's agreement to pre-pay.

66.     Karsan represented to NFL, however, that Indosuez Bank returned the money because Karsan would not pay Indosuez Bank extra commissions on the transfer. Karsan's contentions in this regard were false.

67.     Following Indosuez Bank's refusal to take part in the transfer of funds to Karsan, Karsan opened a new account with Pictet Bank, also in Geneva, Switzerland.

68.     At the same time Karsan opened its account with Pictet Bank, Tuncay Alankus, the Chairman of Karsan, and Cihan Karanci, Karsan's commercial advisor, also opened accounts at Pictet.

69. On November 24, 1995, NFL once again instructed its bank, the State Bank of India in New Delhi, to send Karsan the $37,620,000. However, this time State Bank of India transferred the funds to the newly-opened Pictet Bank account established by Karsan.

70. On November 29, 1995, State Bank of India complied with NFL request and transferred the $37,620,000 to Karsan's account at Pictet Bank.

## Karsan Distributes The Proceeds Of The Fraud

71. Although only discovered by NFL long after it happened, upon receiving NFL's $37,620,000 wire transfer, Karsan's immediate reaction was to begin distributing that money to various individuals in control of Karsan and in league with Karsan all around the world.

72. Indeed, on November 30, 1995, the day after NFL's payment reached Karsan's account at Pictet Bank, the bulk of the money transferred to Karsan was then transferred out to a number of other accounts.

73. $28,100,000 was transferred into Mr. Alankus' newly-established personal account at Pictet Bank.

74. $1,100,000 was transferred to Mr. Karanci's newly-established personal account at Pictet Bank.

75. $4,000,017 was transferred to BS Lagu/Edible Foodstuffs Trading in Dubai.

76. $2,000,000 was transferred to Malyn, the entity controlled by the Vepuris, in New Jersey pursuant to the conspiracy between the Vepuris, Karsan, Mr. Rao, and the other co-conspirators.

77. $342,017 was transferred to Mediterranean Insurances in Athens, Greece.

78. $200,026 was transferred to Mr. Rao in Hyderabad, India.

79. $150,000 was directly withdrawn in cash.

80. Following this slew of activity on November 30, 1995, on December 11, 1995 and December 20, 1995, respectively, $400,017 and $800,017 were transferred to Brasil Trading Company in London.

81. As a result of this activity, within a mere three weeks of NFL's transmission of the $37,620,000 to Karsan, all but $527,906 of that money had been siphoned-off and distributed to other entities involved in the fraudulent scheme or designated by Karsan to benefit from the scheme.

## Once Distributed To Karsan's Co-Conspirators, NFL's Money Was Used For The Conspirators' Ends

82. When Karsan initially asked for prepayment of the $38 million from NFL, Karsan represented to NFL that it needed the money up front to finance its activities to obtain the urea deliverable under the contract.

83. Despite Karsan's representations regarding the need for the money, upon information and belief, none of Karsan's November 30, 1995 transfers were made in an effort to secure the urea Karsan was obligated to obtain for NFL.

84. Indeed, the money transferred to all of these bank accounts was, for the most part, only temporarily parked there before being further disseminated.

85. For example, the $2 million transferred to Malyn was commingled with the Vepuris' other assets that had been pooled in Malyn's account at Midlantic. No attempt was made to segregate, earmark, or separately account for Karsan's $2 million transfer to Malyn.

86. Following the transfer of the $2 million to Malyn, the Vepuris simply used or traded all of the funds and securities in the Midlantic account as they saw fit.

87. Malyn's Midlantic account, enriched by the $2 million transfer, continued to be used for high volume trading in securities, with purchases and sales of stock being made on an almost daily basis for the entire time the account was open.

88. The Vepuris also used some of the cash in the Midlantic account to open and begin trading securities through an account in Malyn's name at Olde Discount Corporation ("Olde"), upon information and belief, a discount brokerage house with offices in New Jersey.

89. On two occasions, on December 11, 1995 and February 15, 1996, respectively, $600,000 and $100,000 was transferred from Malyn's Midlantic account to the account at Olde.

90. Although the account at Olde was opened in Malyn's name, the Vepuris had sole authority over the account and directed all trading activity for which the account was used.

91. Following the initial transfer to the Olde account of $600,000 and continuing after the subsequent transfer of $100,000, Malyn's Olde account was used to conduct securities trades at a feverish pace, with margin borrowing used to fund much of the trading, leaving the account highly leveraged as the margin debt grew.

92. Starting in February 1996, the Vepuris began the process of transferring out all of the cash and securities held in Malyn's Midlantic account and depositing them with Olde.

93. On February 15, 1996, the Vepuris transferred to Olde 2,000 shares of Applied Materials (valued at $82,625); 10,000 shares of Micron Technology (valued at $519,215); and 4,000 shares of Sybase Inc. (valued at $154,800).

94.    On May 9, 1996, the Vepuris made additional transfers from the Midlantic account to the account at Olde.

95.    On that day, the Vepuris transferred 24,000 shares of Cypress Semiconductor Corp. (valued at $352,010) and 8,000 shares of LSI Logic (valued at $337,925).

96.    Similarly, on July 16, 1996, the Vepuris transferred 5,000 shares of Bay Networks (valued at $187,775) from Malyn's account at Midlantic to the account at Olde.

97.    The next day, July 17, 1996, the Vepuris transferred to Malyn's Olde account an additional 3,000 shares of Bay Networks (valued at $95,115); 2,000 shares of Kulicke & Soffa (valued at $60,000); 2,000 shares of MRV Communications Inc. (valued at $84,000); and 2,000 shares of RGB Computer & Video Inc. (valued at $35,750).

98.    As these securities were transferred to Olde, they were used as the collateral for additional borrowing on margin to make further, highly-leveraged purchases of the securities of publicly traded companies.

99.    Not only securities were transferred out from the account at Midlantic; cash was transferred just as readily in the continuing effort to liquidate the account.

100.    On July 24, 1996, $1,116,787.50 was transferred from Malyn's Midlantic account to the checking account of Veratek Inc., the company controlled by Mrs. Vepuri and the Vepuris' children. These funds were then used to pay the debts of Veratek and/or used by the Vepuris for their personal debts or spending.

101.    Following or concurrently with this transfer to Veratek, the securities remaining in Malyn's Midlantic account were transferred to Malyn's Olde account.

102.    Following the transfer of the securities to Olde, the Vepuris continued to use the Olde account to conduct securities trades on margin.

103.    After a time, all of the securities on deposit with Olde, which by that time had, upon information and belief, been acquired by H&R Block, were further transferred to an account in Malyn's name at J.B. Oxford & Co. ("J.B. Oxford"), a brokerage firm based in Beverly Hills, California.

104.    Although the J.B. Oxford account was opened in Malyn's name, the Vepuris had sole authority over the account and directed all trading activity for which the account was used.

105.    As the Vepuris had done with the Olde account, from the time the J.B. Oxford account was opened it was used for high volume trading in securities, with much of the trading taking place on margin.

106.    On or about October 31, 1996, Malyn's Midlantic account was closed.

107.    Malyn has since been dissolved by the Registrar of Companies of Bermuda for failing to carry on any business.

108.    Although Malyn had been dissolved, Malyn's account at J.B. Oxford was never closed and remains open in Malyn's name.

109.    The other members of the conspiracy acted in a strikingly similar way to the Vepuris.

110.    Mr. Alankus transferred a total of $1,665,068 from the recently opened account at Pictet Bank in Geneva to Turkiyi Is Bank in Turkey for the benefit of his personal account at that bank and an account in the name of his daughter.

111.    Mr. Karanci transferred $780,068 from his recently opened account at Pictet Bank in Geneva to Turkiyi Is Bank as well, for the benefit of his own account there as well as an account held in his wife's name.

112.    In another striking similarity, the $4 million transferred to Edible Foodstuffs Trading was also further distributed via a web of complex bank transactions.

113.    First, starting on December 5, 1995, the full $4 million amount was transferred to the personal account of a individual named V.J. Paryani. From this account, $3,675,000 was then transferred to a joint account held by D.K. Yadav and B.S. Lagu in the Standard Chartered Bank in Dubai. Most of these funds were surreptitiously transferred back to Mr. Rao in Hyderabad, India by methods which violated Indian law.

114.    The money parked at Standard Chartered Bank in Dubai was thereafter partially distributed in two lump sums.

115.    The first transfer, in the amount of $650,000, went into another joint account at Standard Chartered Bank in the names of D.K. Yadav and B.S. Lagu. This money was subsequently used to make consumer purchases for items such as jewelry.

116.    Another sum of $2,700,000 was also transferred to D.K. Yadav's personal account at the Dubai branch of ABM Amro Bank. This money was used to pay checks, drafts, and for the purchase of gold (including the payment of customs duties on gold).

**Karsan Attempts To Hide The Fraud**

117.    Once Karsan had received NFL's payment of over $37 million, and distributed it to its co-conspirators around the World, Karsan continued to misrepresent its intentions regarding the November 9th Agreement in a series of letters sent to NFL throughout the first half of 1996, most of which were sent when Karsan was in default of its obligations regarding the initial shipments under the November 9th Agreement but sent before Karsan's time to ship the vast majority of urea had expired.

118.   Upon information and belief, Karsan tried to conceal the fraud for as long as possible to prevent NFL from learning of the fraud and taking action to criminally prosecute those involved and to prevent, to the extent possible, NFL from being able to trace and locate the whereabouts of the money wrongfully distributed by Karsan.

119.   On January 1, 1996, Karsan wrote to NFL to assure NFL that it was working on one of the initial shipments of 25,000 metric tonnes of urea and stating that the shipment was delayed because of bad weather conditions in the Commonwealth of Independent States ("CIS"), the countries of the former Soviet Union.  Karsan promised, however, that this shipment would be sent by February 1996.

120.   Then, on February 14, 1996 Karsan wrote to NFL to inform NFL that weather delays and certain technical problems would further delay the shipment.

121.   On February 19, 1996, Karsan wrote to NFL again claiming that 18,500 metric tonnes of urea were reserved for NFL and that an additional 100 metric tonnes of urea were then under production.

122.   On February 26, 1996, Karsan wrote to Mr. Ramakrishnan at NFL to state that 100 metric tonnes of urea had already been produced for NFL pursuant to the November 9th Agreement but that the 18,500 metric tonne shipment was delayed because it was in an area where the ports were frozen-over with ice.

123.   On February 28, 1996, Karsan wrote to Mr. N.K. Gupta, who had taken over Mr. Kanwar's position at NFL as Executive Director of Marketing, stating that Karsan was a co-producer of urea with manufacturing plants established as part of a joint venture in various CIS countries.  This letter again stated that Karsan's problems with shipping the urea required

under the November 9th Agreement were caused by weather conditions and other unexpected problems.

124.    On March 21, 1996, sounding a familiar theme, Karsan again wrote to NFL to assure NFL that the first two 25,000 metric tonne shipments were being prepared for delivery to NFL.

125.    Karsan introduced a new excuse for its failure to perform in its letter to NFL dated March 27, 1996.  In that correspondence, it reiterated its claim that weather conditions were to blame but also, for the first time, claimed that the war in Chechnya had caused problems for Karsan.

126.    All of these statements by Karsan were false.  Subsequent investigation by NFL has determined that, during the period from December 1995 to March 1996, Karsan did not have even one source of supply for urea, that Karsan did not have any contract for the supply of urea that could be performed during that period, and that Karsan had no urea on hand to supply to NFL.

127.    Karsan's misrepresentations regarding its intention to perform continued, in various forms, from April 1996 to August 1996.

128.    During April 1996, NFL sent representatives to Ankara, Turkey to meet with Karsan.  During NFL's visit, Karsan once against promised to perform under the November 9th Agreement.

129.    To this end, on April 24, 1996, Karsan sent NFL a letter in which Karsan promised to deliver the full 200 metric tonnes of urea on a revised schedule.  Karsan promised to spot purchase 75,000 metric tonnes of urea on the World market and supply that urea to NFL before the end of May 1996.

130.   Karsan further promised that the other 125,000 metric tonnes of urea would be delivered or shipped on the following schedule:

- 25,000 metric tonnes to be delivered by June 15, 1996.
- 25,000 metric tonnes to be delivered by July 10, 1996.
- 20,000 metric tonnes to be shipped by August 8, 1996.
- 55,000 metric tonnes to be shipped by September 15, 1996.

131.   When Karsan made the representations regarding this revised timetable, Karsan had absolutely no intention of performing as indicated.

132.   Except for one non-conforming shipment of urea, representing less than 5% of the total amount called for under the November 9th Agreement, which NFL rejected, Karsan never shipped any urea to NFL.

133.   Moreover, Karsan's bad faith is illustrated by Karsan's refusal to provide NFL with an opportunity to inspect the urea Karsan claimed it was prepared to ship to NFL despite NFL's repeated requests that it be given an opportunity to do so.

134.   Karsan later tried to justify its failure to ship any of the urea called for by the November 9th Agreement, and its retention of over $37 million of NFL's funds, based upon Karsan's allegation that NFL was in breach of the agreement because NFL refused to re-transfer the $380,000 for the insurance coverage after it discovered that the policy did not cover the risk of Karsan's non-performance or non-delivery.

## Actions Of The Indian Authorities

135.   Judge Alfred M. Wolin of the United States District Court for the District of New Jersey issued an order on May 30, 1997 appointing Patrick L. Rocco a commissioner to assist India regarding alleged violations of the laws of India by persons outside the United States and Commissioner Rocco requested that Defendant Murty S. Vepuri provide information regarding Malyn, NFL, Karsan and the $2,000,000 sent by Karsan to Malyn.

136. In response to a written questionnaire issued to Mr. Vepuri by Commissioner Rocco, Mr. Vepuri, in an affidavit sworn to on June 11, 1999, asserted his Fifth Amendment privilege against self-incrimination and would not answer any questions.

## FIRST COUNT

### (Against Both Defendants For Fraud)

137. NFL reasserts and realleges each of the allegations made in paragraphs 1 through 136 above.

138. To induce NFL's agreement to the November 9th Agreement, Karsan intentionally made a number of misrepresentations of fact to NFL.

139. Karsan made these fraudulent statements of fact to further a conspiracy to defraud NFL that included as two of its participants Mr. Vepuri and Mrs. Vepuri acting through their alter ego, Malyn.

140. Among false and fraudulent factual misrepresentations Karsan made to NFL were:

   a. That the $38 million NFL paid would be used as the purchase price for urea as opposed to being fraudulently siphoned-off and paid to various individuals and entities throughout the world;

   b. That Karsan was a manufacturer of urea fertilizer;

   c. That Karsan intended to, and had the ability, to perform pursuant to the November 9th Agreement;

   d. That Karsan would obtain a first-class Lloyds insurance policy to protect against the risk of Karsan's non-performance of the agreement or non-delivery of urea;

    e.      That Karsan, in 1996, was manufacturing urea, had set aside quantities of urea for NFL, was poised to ship urea to NFL, and that Karsan was loading urea onto vessels for shipment to NFL; and

    f.      That Karsan's performance under the November 9th Agreement was hindered by weather conditions and war.

141.    These misrepresentations were the means by which Karsan and the conspiracy furthered the overall objective of the fraud: the acquisition of over $37 million of NFL funds and the redistribution of those funds to the conspirators, including the Vepuris in New Jersey, located all over the globe.

142.    Karsan's representations on each of these points were knowingly false and meant to induce NFL to act in a way that it would not have had NFL known the truth.

143.    Once Karsan had induced NFL to enter into the November 9th Agreement, Karsan and Mediterranean Insurances falsely represented the coverage available under the insurance policy Karsan had obtained to further induce NFL to make the $37,620,000 prepayment called for by the agreement.

144.    At the time Karsan and Mediterranean Insurances made these representations, both knew that they were false. They nevertheless made these false representations because they knew that NFL would not have made the prepayment had NFL known the true details of the limited coverage provided by the insurance policy Karsan had obtained.

145.    Once it became clear that Karsan was in default of the November 9th Agreement, Karsan furthered and continued the fraudulent scheme by repeatedly falsely assuring

NFL that urea shipments were being prepared, that urea was being manufactured, and that any delay was due to weather conditions or hostilities in Chechnya.

146.   Karsan intentionally made these numerous misrepresentations to delay NFL's investigation of Karsan's and the conspiracy's fraud.

147.   NFL believed Karsan's and Mediterranean Insurances' representations and justifiably relied on those representations.

148.   As a result of NFL's reliance upon Karsan's misrepresentations, NFL has been injured by the loss of over $37 million.

149.   Of this loss, $2 million is attributable to the monies transferred by Karsan to the Vepuris, though Malyn, into New Jersey on November 30, 1995.

150.   At the time the Vepuris received this money in New Jersey, they completely controlled Malyn such that Malyn's receipt of the money was in reality for the Vepuris' benefit alone.

151.   Upon information and belief, at and after the time the funds were received in Malyn, the company they controlled, the Vepuris were fully aware that the $2 million being received was part of the proceeds of a massive fraud perpetrated by their co-conspirators against NFL, and that numerous false statements and representations had been made to NFL by the co-conspirators to get NFL to pay the $38 million to Karsan.  Likewise, the Vepuris were fully aware that they were receiving, and obtaining control over, fraudulently obtained funds which they had no right to receive.

152.   In November 1995, and certainly by May 1996, the Vepuris were aware that the $2 million was part of the proceeds of a massive fraud.

153.   Mr. Vepuri actively assisted Karsan, Mr. Rao, and the other co-conspirators in their continuing efforts to hide the $2 million and prevent NFL from reclaiming the money.

154.   During the May 1996 to June 1996 time period, Mr. Vepuri – while in India and from the United States – made numerous attempts to contact Mr. Rao to discuss the disposition of the $2 million. Mr. Vepuri's interest in speaking to Mr. Rao was prompted by the Indian authorities' discovery of the scam.

155.   Mr. Rao was under arrest in India at the time, which arrest was made by the Indian authorities as part of the investigation of the urea scam.

156.   Mr. Vepuri's calls to Mr. Rao resulted in a call to Mr. Vepuri from an Indian attorney named S.K. Sharma. At the time of this call, Mr. Sharma was, upon information and belief, an attorney working for both Karsan and Mr. Rao in connection with the Indian authorities' investigation of the urea scam.

157.   Mr. Sharma advised Mr. Vepuri to retain the $2 million and hold it, as he had done so prior to speaking with Mr. Sharma, pursuant to the Vepuris' agreement with Karsan and Mr. Rao.

158.   Subsequent to their conversation regarding the $2 million, Mr. Vepuri and Mr. Sharma met in the United States, at Mr. Sharma's hotel, during which meeting Mr. Sharma again instructed Mr. Vepuri to retain the $2 million and continue to hold it as he had done since it was received in November 1995.

159.   Following the meeting at Mr. Sharma's hotel, Mr. Vepuri and Mr. Sharma flew to Bermuda to meet with Malyn's attorney, Ian Kawaley, to discuss the $2 million transfer,

the investigation of the urea scam in India, and the fact that the Vepuris, through Malyn, were in possession of the proceeds of the fraud.

160.    At all times when Mr. Vepuri was meeting with Mr. Sharma and Mr. Kawaley, Mr. Vepuri knew or should have known that the $2 million Malyn received from Karsan was money belonging to NFL over which Karsan, Mr. Rao, Mr. Sharma, and the Vepuris had no right to exercise any dominion or control.

161.    At no time did the Vepuris attempt to contact NFL, the Indian authorities, or authorities in the United States to report Malyn's receipt of the $2 million from Karsan.

162.    Moreover, at no time did the Vepuris ever make any attempt to segregate or individually account for the $2 million. Indeed, to this day the money remains co-mingled with the Vepuris' other assets.

163.    The Vepuris' failure to alert the authorities about their retention of the $2 million derived from the fraud perpetrated upon NFL springs from the Vepuris' intention to further the fraudulent scheme, benefit themselves, and help stymie any effort by NFL to reclaim its money.

164.    Indeed, during the pendency of the investigation of the urea scam by the Indian authorities, the Vepuris have not only followed Karsan's and Rao's orders concerning the Vepuris' retention of the money, they have also furthered the scheme to defraud NFL by helping Karsan and Mr. Rao disburse the money surreptitiously.

165.    For example, in 1998 Mr. Vepuri issued a check linked to Malyn's brokerage account at J.B. Oxford to an individual named "SAGAR" in the amount of $50,000. Mr. Vepuri not only issued the check on Mr. Rao's and Karsan's instructions, he also had it

deposited into SAGAR's account at Commercial Bank of New York as Karsan and Mr. Rao demanded.

166.    Mr. Vepuri also issued a check for $50,000 to an individual named Shyamalal Punjabi at Karsan's and Mr. Rao's direction. This check, however, was issued on a check linked to a checking account maintained by Veratek.

167.    Mr. Vepuri did not know SAGAR or Shyamalal Punjabi. These payments were made only because Mr. Vepuri was told to make them by Mr. Rao and/or Karsan, or someone acting on Mr. Rao's and/or Karsan's behalf.

168.    At all times, the only concern of the Vepuris was to act in furtherance of the conspiracy to defraud NFL by taking orders from Karsan and Mr. Rao.

169.    NFL, therefore, demands judgment in the full amount of its damages, plus interest from November 29, 1995 to the date of satisfaction of judgment, plus punitive damages on account of the Vepuris' willful participation in a conspiracy to willfully injure NFL.

## SECOND COUNT

### (Against Both Defendants For Conversion)

170.    NFL reasserts and realleges each of the allegations made in paragraphs 1 through 169 above.

171.    The $2 million transferred into New Jersey by Karsan to Malyn, the corporation under the control of the Vepuris, was and still is the property of NFL.

172.    At the time Malyn obtained possession of NFL's property, Malyn was under the complete control of the Vepuris, Malyn's principal directors, and acted as the Vepuri's alter ego. As such, the Vepuri's were the true beneficiaries of the Karsan's transfer of the funds to NFL.

173.    NFL has a right to the immediate possession of the $2 million.

174.    The Vepuris' retention of NFL's $2 million is unauthorized, wrongful and inconsistent with NFL's right to possession of the $2 million.

175.    Moreover, the Vepuris, as directors of Malyn, are liable for Malyn's conversion of NFL's property since they, and each of them, participated in the conversion of NFL's property by aiding, instigating, and/or assisting in Malyn's conversion of those funds.

176.    NFL, therefore, demands judgment in the full amount of its damages, plus interest from November 29, 1995 to the date of satisfaction of judgment, plus punitive damages on account of the Vepuris' willful conversion of NFL's funds.

## THIRD COUNT

### (Against Both Defendants For Unjust Enrichment)

177.    NFL reasserts and realleges each of the allegations made in paragraphs 1 through 176 above.

178.    Karsan's transfer of NFL's $2 million conferred a benefit upon the Vepuris as the individuals in total control of and acting through Malyn.

179.    The Vepuris did nothing to entitle them to possession of NFL's $2 million, nor to the benefit of the receipt of NFL's property.

180.    Allowing the Vepuris to retain NFL's property would be unjust and inequitable.

181.    NFL, therefore, demands judgment in the full amount of its damages, plus interest from November 29, 1995 to the date of satisfaction of judgment.

## FOURTH COUNT

### (Against Both Defendants For Imposition Of A Constructive Trust)

182.    NFL reasserts and realleges each of the allegations made in paragraphs 1 through 181 above.

183.    Karsan, and the conspirators with which it worked to defraud NFL of over $37 million, acted wrongfully.

184.    Karsan further acted wrongfully in transferring $2 million of NFL's property to the Vepuris through Malyn.

185.    In accepting the $2 million wrongfully transferred to it, retaining that amount without any basis for doing so, and in using that property for their own benefit, Malyn and/or the Vepuris have acted wrongfully.

186.    The Vepuris used Malyn to purchase stocks and other property utilizing the money wrongfully transferred from Karsan.

187.    The evidence shows that the Vepuris used NFL's money to obtain a varied portfolio of hundreds of different securities. The evidence also shows that the Vepuris used NFL's money as the basis for establishing a margin account, which the Vepuris used to purchase further shares of securities on credit.

188.    Upon information and belief, the Vepuris have sold or transferred the property they purchased through Malyn.

189.    Upon information and belief, the Vepuris have purchased other property in their own names, or in the names of other companies they control, with the proceeds they derived from the scheme to defraud NFL.

190.    If the Vepuris are allowed to retain the securities and other property they purchased with NFL's money, including the proceeds of any sale of that stock or property, it would result in an unjust enrichment of the Vepuris at the expense of NFL.

191.    NFL has no adequate remedy at law by which to restrain the Vepuris from further transferring the securities and property they have obtained with NFL's funds in an

attempt to prevent NFL from claiming that property. Nor does NFL have an adequate remedy at law to restrain the Vepuris from otherwise distributing the proceeds of any sale of the property that may have already occurred.

192.   NFL, therefore, demands that the Vepuris be enjoined and restrained, and a constructive trust impressed, preventing the Vepuris from disposing of or distributing any of the assets they have purchased with NFL's funds, including the shares of stock they have purchased, as well as any proceeds from the sale of that property, during the pendency of this action and until such time as the amount of NFL's claim is established, adjudged, and paid.

### FIFTH COUNT

### (Against Both Defendants For Civil Conspiracy)

193.   NFL reasserts and realleges each of the allegations made in paragraphs 1 through 192 above.

194.   The acts of Karsan, Mr. Rao, the Vepuris and the other co-conspirators have resulted in a loss to NFL of over $42.67 million, which amount includes millions of dollars which NFL has been forced to spend in an attempt to recover the funds Karsan stole via litigation all over the world.

195.   Among NFL's attempts to recover the $37,620,000 it lost due to Karsan's and the conspirators' fraud has been to engage in arbitration with Karsan.

196.   NFL was victorious in the arbitration and was awarded $37,620,000 plus interest.

197.   Despite these successes, NFL has been unable to recover the money lost through the fraud.

198.   As a co-conspirator with Karsan, Mr. Rao, and the others, the Vepuris are jointly and severally liable to NFL for all amounts lost due to the urea scam.

199.   At all relevant times, the Vepuris were acting as part of a group of conspirators.

200.   These conspirators, including the Vepuris, acted in concert with each other to defraud NFL and attempted to put NFL's funds, once stolen, beyond NFL's reach.

201.   An agreement exists between the Vepuris and the other members of the conspiracy – namely Karsan and Mr. Rao – to defraud NFL and secure the proceeds of that fraud.

202.   Circumstantial evidence of this agreement is evident from the fact that the Vepuris, on numerous occasions, acted at the request of Karsan and Mr. Rao to prevent NFL's funds from being recovered by NFL and to distribute those funds for the conspirators' ends.

203.   The Vepuris' actions have damaged NFL.

204.   NFL, therefore, demands judgment in the full amount of its damages, plus interest from November 29, 1995 to the date of satisfaction of judgment, plus punitive damages on account of the Vepuris' willful participation in the conspiracy to defraud NFL.

WHEREFORE, National Fertilizers Limited demands judgment against defendants Murty S. Vepuri and Varalaxmi Vepuri for:

1.   One Counts One through Three, compensatory damages in an amount to be determined at trial;

2.   On Count Four, the imposition of a constructive trust in NFL's favor;

3.   On Count Five, compensatory damages equal to the full amount of NFL's losses from the urea scam, which losses resulted from the actions of the Vepuris and the actions of the other co-conspirators referenced in that Count;

4.     punitive damages;

5.     interest from November 29, 1995 to the date of satisfaction of judgment;

6.     costs of suit including reasonable attorneys' fees; and

7.     such other and further relief as the court deems just and proper.


## DEMAND FOR A JURY TRIAL

Plaintiff NFL hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury as to all issues in this action triable before a jury.

Dated:     June 17, 2003

Respectfully submitted,

Paul L. Kattas (PK 6222)
KELLEY DRYE & WARREN LLP
5 Sylvan Way
Parsippany, New Jersey 07054
(973) 539-0099

-and-

Paul F. Doyle (*Pro Hac Vice*)
Philip D. Robben (PR 4135)
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
(212) 808-7800

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

-----------------------------------------------------x

| | |
|---|---|
| NATIONAL FERTILIZERS LIMITED, | : |
| Plaintiff, | :  Civil Action No. 01-5397 (JAG) |
| -against- | : |
| MURTY S. VEPURI and | :  __AFFIDAVIT OF SERVICE__ |
| VARALAXMI VEPURI, | : |
| Defendants. | : |

-----------------------------------------------------x

STATE OF NEW YORK     )
                 : SS.:
COUNTY OF NEW YORK   )

      Rodney F. Felder, being duly sworn, deposes and states:

1.    I am not a party to this action, am over 18 years of age.

2.    On 17th day of June, 2003, I served the annexed **SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** upon the following attorneys at the address designated by them for service of papers:

> George R. Talarico, Esq.
> Wolff & Samson P.C.
> The Offices at Crystal Lake
> One Boland Drive
> West Orange, NJ 07052-3698

by depositing true copy of said document enclosed in a prepaid, sealed wrapper, in an official depository under the exclusive care and custody of the United States Post Office, within the State of New York.

_Rodney F. Felder_
Rodney F. Felder

Sworn to before me this
17th day of June, 2003.

_Gary E. Lawson_
Notary Public

GARY E. LAWSON
Notary Public, State of New York
No. 01LA6063555
Qualified in Kings County
Commission Expires September 4, 2005